UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DERWIN JONES,

        Plaintiff,

v.                                         Case No. 15-C-550

LISA BUHS,

        Defendant.

## DECISION AND ORDER

In this action the Plaintiff, Derwin Jones, alleges that Dr. Lisa Buhs, a prison psychologist, discriminated against him because of his race and retaliated against him for appealing his criminal conviction. Buhs has moved for summary judgment. For the reasons that follow, the motion will be granted.

After seeing Dr. Buhs several times for therapy, Jones decided to join a two-year sex offender treatment program called SO-4, which Buhs facilitated.[1] The group consisted of some thirteen inmates, four of whom were black, including Jones. Dr. Buhs also saw Jones individually during the relevant time and appears to have spent a great deal of time with him. At times, matters discussed in the group became heated, and some inmates occasionally resorted to the use of racial slurs. In an extensive report prepared before this lawsuit was filed, Dr. Buhs noted that although Jones had some positive interactions in group therapy, he was very often confrontational and

---

[1] It appears that SO stands for Sex Offender.

inappropriate, sometimes telling others that their presentations were "terrible" or "garbage." (ECF No. 41-1 at 68.) At least some of his behavioral problems stemmed from his belief that the other members of the group were racist and were conspiring against him. (*Id.*) Dr. Buhs opined that Jones too quickly resorted to citing racism as an explanation for others' conduct rather than focusing on his own behavior. (*Id.* at 69.) Buhs also highlighted Jones' inappropriate interactions with the group's other facilitator, Ms. McKay, which generated a verbal warning.

In April 2014, Jones had a court hearing. One tenet of the SO-4 program was that participants needed to accept responsibility for their crimes, and part of that responsibility included a prohibition on filing appeals. Accordingly, although Jones was merely seeking a sentence reduction (rather than challenging his guilt), he was nervous that Buhs would view his court hearing unfavorably. Prior to the hearing, therefore, he submitted a psychological services request informing Buhs that he had a hearing on April 24 and that he was not contesting his guilt. (ECF No. 41-1 at 91.) Dr. Buhs received the communication and wrote a "to whom it may concern" letter, dated April 3, indicating her preference that Jones be returned to prison in time to attend his group meeting sessions. (*Id.* at 158.) There was no indication from Buhs that there was a problem with the hearing. Jones was apparently still nervous about being terminated from the treatment program, however, so he asked the sentencing judge to write Buhs a letter explaining the situation. Dr. Buhs told him "that's not necessary." (*Id.* at 99.) Jones had another hearing in July, and in advance he again ran it past Buhs. "Dr. Buhs are you sure everything is fine with my resentence hearing . . . I am not fighting my conviction I am only trying to get a sentence reduction." (*Id.* at 119.) Buhs responded, "Everything is fine." (*Id.*)

According to Dr. Buhs' account, Jones' behavior eventually gave rise to three written

2

warnings, which meant he was expelled from the group. First, he failed a polygraph examination. During the exam he was rude to the examiner and stated that he didn't care about the results. (*Id.* at 69.) A second warning came after what Dr. Buhs described as an aggressive interaction with another group member. At this point, having received two strikes, Jones became even more worried about being kicked out of the program, so much so that he signed his homework "Derwin Two Warnings Jones." (*Id.* at 70.) The third and final warning resulted from what Buhs called a very aggressive and hostile presentation toward other group members. Again, he focused on racism and his belief that group members call him racist slurs behind his back. (*Id.*) Dr. Buhs described his style as "angry, intimidating and hostile," which resulted in a "tense" group session that day. (*Id.*) Buhs concluded her report as follows:

> Mr. Jones did well in some parts of group, particularly his presentations about his sex offending and related violent behaviors. Staff made every effort to work with Mr. Jones to help him succeed in the group. This writer and the other facilitator gave him a lot of extra time and attention outside the group. However, his aggressiveness and difficulties getting along with his peers, his disrespectful interactions with one of the facilitators, and his ambivalence about wanting to change got in the way of his successful group completion.

(*Id.* at 72.)

Jones' story is different. He alleges that not only did Buhs tolerate the use of racial slurs by other inmates in the group, she personally used such terms, including "coon" "jungle bunny" and "monkey," at every meeting. (ECF No. 48 at ¶ 41.) He asserts that Buhs deliberately only allowed a single black member in every one of her groups, which allowed all the white members to gang up on the single black member. He asserts that when Buhs learned about this lawsuit, she quickly added several black members to the group to make it look more balanced. He also claims that Buhs forced him to write assignments about his views on racism, which she would then destroy so that

3

no one in the prison administration "got wind" of what she was doing. (*Id.* at ¶ 40.) Moreover, all of the documents Buhs has provided in this action are fraudulent and a "forgery," to the extent they purport to be signed by Jones.

**I. Equal Protection**

Jones asserts that Buhs kicked him out of the SO-4 program because of his race rather than because of any legitimate reasons. The equal protection clause of the Fifth or Fourteenth Amendments prohibits government actors from applying different legal standards to similarly situated individuals. *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439 (1985). To prove a race discrimination claim, a plaintiff must produce evidence showing that as a racial minority he was treated differently from similarly situated white inmates and that the defendant acted with a discriminatory purpose or intent. *Minority Police Officers Ass'n v. South Bend,* 801 F.2d 964, 966 (7th Cir. 1986). Discriminatory intent may be established by showing an unequal application of a prison policy or system, but conclusory assertions of racism are insufficient. *Id.* at 967.

In a case like this, it will be difficult for an inmate to identify any non-black inmates who were similarly-situated because each participant in a sex therapy group will be unique. Here, the Plaintiff does not even attempt to identify a non-black participant who was treated more favorably. Nor is that surprising: he was disruptive, failed polygraph exams, and had well-documented behavior problems, to the extent he felt the need to apologize to Dr. Buhs. His failure to identify any similarly-situated inmates alone warrants summary judgment in favor of Buhs. *Malone v. Lundquist,* No. 08-C-0570, 2010 WL 1286727, at *5 (E.D. Wis. Mar. 29, 2010) ("Malone fails to identify any Caucasian inmates who received more favorable recommendations, yet were similarly

4

situated to him in terms of their conduct record . . .")

In addition, it appears the Plaintiff's case is based on a web of invective rather than any actual facts. For example, he continuously argues that he was the only black member of the group, but that is contradicted by Dr. Buhs' sworn assertion that there were three black group members, with a fourth added later. (ECF No. 41 at ¶ 83.) In contrast to Jones' statement, which is merely argument, Dr. Buhs' sworn declaration is actual evidence upon which a court may rely. Moreover, the Plaintiff's assertions are contradicted by his own handwritten missives to Dr. Buhs. In one, dated August 24, 2014, he apologizes for the incident that ultimately got him terminated. (ECF No. 41-1 at 137.) He indicates that he was ashamed for his conduct ("my anger got the best of me") and that "I know in my heart that you [and] Ms. McKay is not racist." (*Id.*) "No matter where I am in life or what I am going through I will never forget your patience and time that you have shown me." (*Id.*) "You may not believe this, but you have spen[t] more time with the helping me correcting my life than my own mom has." (*Id.*) These kinds of sentiments, expressed contemporaneously with his termination from the program, are strongly at odds with Jones' current claims that Buhs frequently used racist language and targeted him for failure because he was black. In short, even if Jones had established a *prima facie* case of discrimination, a jury could not reasonably agree with his more recent version of events.

**II. Retaliation**

The Plaintiff also alleges, somewhat contradictorily, that Dr. Buhs terminated him from the program because he had two court hearings seeking to get his sentence reduced. (Ultimately he was unsuccessful.) Once again, this is based on pure speculation rather than any actual evidence. First, Jones does not explain why a prison psychologist would care about an inmate's effort to get his

5

sentence reduced. Typically a retaliation claim alleges that a prison guard retaliated against an inmate because the inmate filed a complaint *about the guard*. The guard is threatened by the lawsuit, and therefore retaliates against the inmate. Here, by contrast, the sentence reduction had nothing to do with Dr. Buhs, and so not surprisingly she told him more than once that it was okay if he went to his hearings. The hearings simply did not affect her in any perceptible fashion, and neither did they impact his ability to participate in the SO-4 program. At its essence, the only thing linking the hearings to his termination from the program is the fact that they occurred during the same summer. Without any plausible reason to connect the two, the coincidental timing of the two events is not enough to create a genuine issue of material fact as to retaliation.

**III. Conclusion**

    For the reasons given above, the Defendant's motion for summary judgment is **GRANTED** and the case is **DISMISSED**.

    **SO ORDERED** this 7th day of September, 2016.

    /s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court